Thank you, Your Honor. I would like to reserve three minutes for rebuttal. As the Court's aware, this case is before this Court and across the fields of the District Court's order granting in part and denying in part motions for summary, cross motions for summary judgment. I'm going to talk very briefly first about why the denial of underwriter's motion should be affirmed, and then I'm going to talk about why the denial of our motion should be affirmed. The District Court correctly found, based on the undisputed facts, that the underwriter's colluded, as that concept has been comprehensively articulated in the Dillingham case, to erode the limits of their primary layer of insurance, and I quote, to the maximum extent possible. And they did that by labeling almost the entirety of the settlement payment to SFA as a payment of indemnity. And that collusion, summary judgment for Scottsdale underwriter's equitable contribution claim under well-established precedent in this Court. Now, with respect to Scottsdale's claim against underwriters, however, we submit the District Court did commit error when it held that notwithstanding underwriters' egregious conduct, there was, and I quote, no basis in law, close quote, even to review whether underwriters acted in bad faith to allocate the SFA settlement artificially to exhaust their limits. The District Court essentially accepted underwriters' argument, which they candidly repeated to this Court, and I'm going to quote, there is no good faith rule in the case law pertaining to exhaustion of primary limits. Now, one other thing before I get into the merits of that, I do want to note that, importantly, the District Court, very interestingly, went on to say what it would have done if its hands were not tied on this issue, and that's very instructive. Here's what the District Court said. The entirety of the SFA settlement, the entirety, would be allocated to underwriters' extra contractual liability with the policy limits of both the primary policy and the first access policy remaining intact. That's what he said if his hands were not tied, but the District Court believed, incorrectly, that, quote, there is no basis in law that were permitted to review the settlement and the allocation and exhaustion. We believe that the District Court's view of the law is incorrect, first, even as it existed at the time under the state of California press, which, while limited in terms of case numbers, supports the notion that a court can review in a bad faith exhaustion of limits, but to the extent there was any question about what the law required at the time the judge ruled, this Court's ruling in access, I think, removes all Scott's deal. It's not arguing that it has reserved a contractual right to challenge underwriters' artificial allocation, but it has asserted from day one that underwriters' allocation was done in bad faith and is subject to review by this Court. Turning first briefly to the existing precedent, the trial court ignored well-established California law, including especially Amato and Dillingham, and all these cases had slightly different fact patterns than ours. We admit that. Proper actions of the insurers in those cases are exactly what the underwriters did here. Underwriters denied coverage. Amato expressly holds that an insurer should be held responsible for, quote, the detriment approximately caused by its failure to defend, ending the quote. In finding that, in Amato, the insurer was liable for the full amount of the unopposed judgment, and underwriters expressly acknowledged and understood that by wrongfully denying coverage, they had exposed themselves to that risk. And I'm going to cite to the Court the ER 614 to 616, but I'm not going to discuss that in detail because it's part of the document under seal. But those excerpts, if there is any question about what underwriters understood their exposure to be after they settled this and they were trying to resolve it, I believe that will remove any doubt. Can I just ask a question on, make sure I'm hitting, understanding these issues correctly. You focus a lot in your argument on the bad faith, but it seems to me, I mean, we don't even have to get to whether there was bad faith or not or what they knew. Isn't it fundamental to be able to say that you should be able to challenge a decision to settle that could affect your interests? Am I, I mean, am I oversimplifying it too much? There's no oversimplification of the premise. The challenge, candidly, in the primary context comes in, well, when do you know that there was a collusion when they were exhausting the limits by virtue of the settlement? So it is unlike a direct insured versus insurer situation where the insurer knows exactly what's happening to them. At the primary level, we are sitting back watching to see, well, what's going to happen here? What are they trying to do here? And we didn't really know until after they had settled. And then after they had said, oh, by the way, this is, this is on you because we had to settle and it's all impaired limits and all the liability that they knew they faced for extra protection and bad faith was essentially wiped under the rug or all but 7%. Well, but then let me ask a follow up because if you can it, and as you said, you were watching it from a distance, you were aware this was going on. Are you, is there anything in the law that precludes you from coming in and challenging it where you did decide to sit on the sidelines, meaning you had some suspicion that this would affect your interests and you chose to sit on the sideline. Does that bar you in any way from coming in after the fact and challenging it? Well, if I may run, I might take just a little bit. We chose to set on the sidelines. Initially we were not even notified the claim. What was in our deal? We thought it was well within limits. I mean, recall, this is a, this is a claim that the, the, the, the insured said, hold on just a second. Let me back up because there's a lot of facts scrolling in here and I want to make sure when you say initially, when you say initially, you mean when the claim was first tendered and denied by underwriters, is that correct? Yes. Okay. But then it was denied. Are you, but then you knew after they, after there was this, you know, $64 million what verdict or judgment and then they came back and said, well, we want offset because we believe that, uh, the underwriters is responsible for some of that. You were aware of that action, correct? We, we were not aware, uh, until after the $64 million judgment, what now all of a sudden, wait, this is, this is this, this could be honest. And then we jointly, we jointly with underwriters hired counsel to try to address the problem. So we did act, we did, we paid our share. Okay. So you participated once the allocation debate, uh, and negotiations were going on. Right. We were, we were, we were in the room, so to speak. Um, bluntly, we didn't have our checkbooks out, but we were in the room. Um, and you know, I, I think we, at the time Scottsdale took the position under the law that where there's been a judgment, uh, because it's unopposed and judgment is on the primary carrier. We believe that was good law, even before access. Um, and I don't, I don't know that counsel is, uh, or underwriters have said, no, that's the model case basically isn't correct. They aren't challenging the model. Second, I don't believe they're challenging Dillingham, which is if you can't show, if you can't show a good faith allocation, then I want to, I want to quote this because this is an important quote, um, an allocation that is collusive and Dillingham explains what that is. And that's exactly what the district court found quote is suspect. If allocation appears to be the result of collusion between the parties and it goes on to state the trial court must, must find that the settlement, or at least the allegation was not in good faith as a matter of law and reject the settlement. And we believe that we were entitled to stand on that principle of law and say, do not show underwriters. If you, if you say this is partly on us, you have to show in good faith how you get there. And their inability to do that is exactly the you have to act, you have to, you have to act in good faith when you exhaust. And I will be very interested in underwriter's position before this court is because they've said there is no case law that says we have to act in good faith. That's a very aggressive statement. I think it's incorrect. And maybe, maybe they still believe it. Maybe they don't. But to the extent that there's any question at all about whether between Amato and Dillingham, underwriters have to be held responsible for the settlement unless they can show in good faith. Otherwise, this court's decision in access, which came after the district court, makes it pretty clear. If, if, if, if a, if a carrier acts in bad faith and to exhaust limits, that's subject to challenge by the access and review by the court. And there is where the district court got it wrong because the district court said, my hands are tied. My hands are tied. I can't review that. I agree. Collusion, bad faith, they have no equity rights against you. But I, my hands are tied because I don't have, I don't think I have the law. What I think is very interesting, if I may, your honor, is that the district court went undefined. If I did have the power to do that, when I applied Dillingham, I, they get nothing against limits. It's their responsibility to show they did this in good faith. If you look at the district court's decision, toward the end of the decision, he goes chapter reverse. They didn't meet any of the criteria. So in that sense, we think that while we maybe had access making it clearer so the district court could have relied on that had it been available, had the district court properly applied, he submitted a motto in Dillingham, you wouldn't even need it. You wouldn't even need access because the bad faith here is so egregious and there's no reading that district court opinion to conclude otherwise. So based on that, given the fact that there's no question, a big part of that, a big part of that settlement went to resolve liability of the carriers rather than insure it's not a limit. And once you get there, once you apply Dillingham, you can't exhaust, use it to exhaust limits. And that's why we would ask this court to reverse that part of the district court judgment about. Yes. I can interject a question, please. Of course. If this goes back to the district court, do you have to show bad faith to get a recovery? We know your honor, what we, first of all, we would submit it. I'd like to, maybe I'll do that in my bottle of wine. It doesn't go back to the district court, but we don't have to show bad faith in the underlying, in the underlying resolution. What I think California law makes clear is underwriters must show good faith. They must show good faith. Here's why the lion's share or some other percentage is fairly allocated to indemnity on behalf of the insurer. And the underwriter's response to that is we don't have to show that. And the reason is they can't show it. They can't show it. They know, they know there was extra protection liability. That question isn't before us, is it? If it is not before your honor, we would submit that as part of the resolution, this case, we would like you to address it. But I see that I'm eating into my rebuttal time and if it's, if it's, if it's okay with the court. Let me make a suggestion. They keep a little powder dry and we'll give you. Thank you, your honor. That's a good rebuttal argument. I will, I will keep my rest of my powder dry. I think I have some for rebuttal. Thank you. Thank you. Now we'll turn to Mr. Williams, who I'm sure has an entire arsenal of dry cotton. Yes, your honor. Thank you. May it please the court. My name is Jeff Williams. I represent the appellees and cross-appellant underwriters in this case. If the court will indulge me, I'm going to approach the issues in the opposite order. As a counsel, I'm going to first address the claim for improper erosion by Scottsdale. And then I'm going to circle back to the equitable contribution claim. In terms of the improper erosion claim, we think there are two key reasons to affirm the court's judgment. One is that there is simply no claim by an excess insurer for improper erosion, absent certain facts that aren't present in this case. Well, that was the holding counsel. Are you telling me that the underwriters can be dead wrong and collect or can put against the policy of the insured the entire amount of their loss and then go to the secondary or to the excess insurer and say, well, $15 million was what we were responsible for because we failed to defend. So now we're going to get into your $15 million and the insured has gotten nothing up to that point. Is that what you're saying? Essentially, your honor, yes. And the question is phrased in a way that I think I'm supposed to say no, but I think, yes, I think that's the law in California. The law in California, specifically the Amado 2 case that was discussed in our briefing, is that the payment of a claim against the insured that happens to be on behalf of a, for a bad faith failure to defend may be charged to the insurer. That's not on behalf of the insured. That's on behalf of the underwriters. The difference in the Axios case, it was on behalf of the insured, not on behalf of the insurer. Well, your honor, the point of the Amado 2 decision, first of all, the language of Amado 2 is telling. If Amado 2 had said that the payment by the insurer has to be made completely separate from the policy limit, or I think it's Scottsdale. Would the underwriters have to even access the policy of the insured if it's their fault that a judgment was rendered or an amount was rendered for their failure to do what they agreed to do? Well, your honor, the, I'm sorry, your honor, I cut you off. Again, what Amado 2 says is that the consequences of the failure to defend have to be borne by the insurer, which we understand and we can see that, but it says those consequences have to be borne in excess of the policy limit. And I think we have to look at the rationale for the Amado 2 rule. The rationale is to protect the insured and put the insured back in the position that it would have been in had it not been for the refusal to defend. So in the ordinary situation, the primary insurer or the only insurer pays the entire resulting settlement or judgment. The consequences of its conduct fall on the insurer, which is contrary to everything that Scottsdale said in this case. The consequences fall on that insurer and what Scottsdale is looking for in this case is either one of two things. One, it's looking for a windfall in that underwriters, in addition to paying the claim, potentially even in excess of their policy limit, would then not only have to pay that claim, but the next claim up against the insured, or Scottsdale would ask this court to establish some sort of procedure by which the district court would have to essentially the underlying case. The court would have to take into account everything that went on in the underlying case and determine, were it not for the refusal to defend, what would have been the damages to the insured? And let's only take that amount and erode the policy by that amount. And that would be a completely inefficient procedure. There's never been any California case to prescribe that procedure. And, you know, it runs contrary to the entire policy of encouraging settlement and minimizing litigation. You know, it would remove settlement. It also gets the excess before the primary policy has paid out on behalf of the insured. I'm sorry, I'm having a difficult time hearing you. Council, could you perhaps mute your microphone, Mr. Keteneck? Oh, I apologize. Excuse me. No problem. I'm sorry, Ron, I couldn't hear you. Okay. It just seemed to me that what you're saying is that, well, we can take the bad faith damages and we'll lay them on the insured. And then if that eats up the primary policy, we just go to the excess carry. And that really, that's not Axios. Well, the Axios case is actually very on point here. I mean, the difference between then the reason it's off point is that the excess insurer was arguing the claim against the insured was not a covered loss. Scottsdale is arguing that the claim against the insurer is not covered. Well, your honor, the underlying premise of Axios is still valid. If the excess insurer wanted to preserve itself a right to dispute the claims handling procedures and an adjustment processes of the primary insurer, it could have placed that provision in its policy. And the insured in this case has not disputed exhaustion of the primary policy. So, and again, Scottsdale is not standing in the shoes of the insured, asserting a right of the insured against underwriters. Scottsdale is asserting its own right as against underwriters that we think is barred by Axios. And really the exception that Scottsdale- Help me understand the theory, because I mean, your initial answer to Judge Kelly is very difficult to swallow. And I'm just trying to figure out a theory under which that makes sense. And the only one seems to be that Scottsdale made their bet is effectively what you're arguing by not coming in and really sitting at the table. They were bound by whatever allocation was made and they can't challenge. Is that, is that what you're arguing? I think those are two separate points, Your Honor. I think the point that Scottsdale cannot challenge the underlying exhaustion is a matter of contract. It's a matter of what they put in their contract and a matter of a dispute that they may have with the insured. That's really not applicable in this case. This is their case against underwriters. And Axios says that they don't have that right unless they can show that underwriters have acted in bad faith or committed fraud. And admittedly, Axios does not define what it means by fraud or bad faith. But we submit that fraud or bad faith cannot mean what happened in this case where underwriters, as you point out, Your Honor, invited Scottsdale to the table. Scottsdale refused to participate in the allocation negotiations, but they were if it's going to mean anything and not swallow the entire rule has to mean a situation for, I mean, the best example I could come up with is some sort of hidden agreement between the insurer and the insured. Let's say, for example, the primary insurer pays a non-covered claim against the insured and the insured says, okay, we'll have a hidden agreement and I'm going to pay you back under the table, but we'll hide this from the excess. So in that situation, what they've done. Your position is the relief that Scottsdale should have sought was to come in and blow up the agreement when they realized, but I thought the allocations weren't made until after the agreement was done. Well, factually, Your Honor, the allocations were. Let me be more precise just for myself as well. The agreement to pay whatever it was, $17 million to the insured, I guess, effectively to the insured, right? Or I guess it was effectively to the insured. So that $17.5 million was, I mean, they didn't really have a basis to come in and step in and blow that up. I mean, because they didn't know that whether they were going to be on the hook or not, they didn't kind of have a, have a dog in this fight until they realized, oh, wait a second. You're the allocation, which happened after the settlement. That's the problem that they're challenging. Isn't that, am I, am I under, am I understanding that correctly? I think you have the timing of the, of this execution of the term sheet, which had the $17.5 million number in there that was executed at the mediation, but critically at mediation, I think this was a misstatement. This is one of the things that we pointed out in our brief. This was a misstatement by the district court because the deposition testimony that's in the record shows that at the mediation and even prior to the mediation, underwriters were pushing Scottsdale on the contribution issue. I mean, I would point the court to the deposition testimony at pages 105 and 06 of the supplemental record, the supplemental excerpts of record where Scottsdale's representative admitted that, that, that under, I think the word he was using was pushed. Underwriters were pushing the contribution issue. So what happened at the, the mediation was that the term sheet was signed. Counsel for all of the parties negotiated that with an eye to look, let's not, as you said, your honor, let's not blow this up. You know, we've got a number that the plaintiff will accept. Let's come, come down to it and let's allocate the number later because Scottsdale and underwriters clearly have some discussions. What this whole case is about is how are we going to allocate that? And so I don't understand why they can't, I don't care whether there was bad faith or good faith or whatever. Why can't they then step in and dispute the allocation? I just, it's counterintuitive to me. Well, the, the reason let, let's, let's, let's set aside the, or not set aside, let's distinguish between the claim that we can't exhaust our policy and the claim that we're not entitled to contribution for purposes of the claim that we can't exhaust our policy. No, your honor, they can't, they can't come in and challenge that because number one, they, they affirmatively abstained from that. They made an unreasonable determination that there was settlement and therefore they didn't engage. And so we, we had no choice, but to, we being my clients had no choice, but to engage in that allocation discussion without their input. What they want now is to say, okay, the underwriters, we're not going to participate. You go ahead and do it yourself, but then we're going to haul you into court and we're going to say, okay, now you present every aspect of that allocation to the court and we're going to get to see, you know, we're going to get to poke holes in it and challenge it when they didn't engage. Personally, I'm presenting that. And I'm just wondering if I'm missing some aspect of insurance law that, that, that is unique, but I don't understand why Scottsdale position Scottsdale's position here is unfair. I mean, if their position really was, we don't know a penny, maybe they're right. They should be able to come in and prove that, you know, without having to I don't know whether they're right or wrong on that. I have no idea what amount there, if any, they would owe. I mean, it strikes me that they owe something, but, but why can't they come in and why do they just have to live with your allocation? Well, they, they, they can come in and they can challenge the allocation in terms of the equitable contribution claim. They can say, we don't know anything under our policy. We don't make that argument. I would argue that in terms of the contribution claim, as we laid out in our briefs and before the district court, we had an adverse allocation of interest, an adverse negotiation of interest that qualifies for the legal presumption of adversity and reliability that qualifies in the Regan roofing case that was established as kind of a, you know, a way to avoid the massive amounts of litigation that would always arise in this context. But in terms of exhaustion of the primary policy, the excess insurer does not have the right to challenge how the primary insurer adjusts its claims. It doesn't have that right in its policy. There's no good faith. Why wouldn't they have the right when some of that allocation goes to them? I mean, you're allocating some of this to them. Why wouldn't they have the right to challenge that? Your point is that the only remedy here, your point is you paid 17.5 or 17.5 was paid. The only remedy here should be for you to sue them for equitable contribution. And that's how this should be determined. Is that your point? No, no, I'm sorry, your honor. That's not correct. With respect to the primary policy exhaustion issue, the issue we're not trying to assign any of the money that was paid under the primary policy to Scottsdale. That's a separate issue. The primary policy was exhausted by the payment. And because of cases like Axis, and frankly, because of cases like Amato, which hold that the bad faith payment does exhaust policy limits, or at least suggest that by saying the payment is in excess of the policy limit, then yes, Scottsdale doesn't have that right to come in and challenge. The excess, the amount that does impact the excess policy, we're having a discussion about that. That's the equitable contribution claim that we paid. The only reason we're suing them is because we paid it and now we're suing to get it back. But if they paid it, they would sue us. Got it. I understand. Okay. Okay. Could I interject a question that may only show that I don't understand insurance law at a time? I'll give you three choices. One, does Lloyd's have the burden of showing it acted in good faith? Or two, does Scottsdale have the burden of showing Lloyd's acted in bad faith? Or three, neither of the above? The answer to the question is two, Your Honor. Scottsdale has the burden of showing that underwriters acted in bad faith if it wants to challenge the exhaustion of the primary policy. That was the express holding of the court in Axis, which said that if the excess insurer wants to invoke the exception for fraud and bad faith, it expressly said that that burden is on the excess insurer. Okay. Thank you. I believe I'm past my time. Yes, Your Honor. So I will submit on that basis unless the court has any questions for me. Did Judge Kelley or Judge Nelson have any questions at this time? Thank you, Mr. Williams. Thank you, Your Honor. Mr. Katanak. Thank you, Your Honor. What counsel has done is conflate the difference. I thought I had three minutes, but I might be wrong. The clerk set that argument. I've got three minutes. Thank you, Your Honor. Underwriters are saying if we pay anything, it counts against limits. Basically, the implication is we don't have to pay for indemnity to count against limits. We can pay our own liability. That is not the law. There's just no statement of the law that reads out for indemnity in that they have to pay for liability to their policyholder, not their own. So the notion that whether they pay $17 or $20 or $10, if that $10 is their liability, not the insurer's, it shouldn't go against limits. Number two, the notion that we're going to have to go back and retry everything, I would fundamentally reject that, Your Honor, and there are two reasons for why that is. We don't need to go back and present every aspect of the case. What you did not hear was we, underwriters, have other evidence of a good faith allocation. They have the burden of showing this is a good faith, that's what Dillingham said, that's what the district court said, and the district court goes undefined. If you apply Dillingham, and we would submit you must apply Dillingham because they haven't come up with any evidence other than the sham allocation, which nobody believes. Under Dillingham, they must establish some good faith basis for what they did. They have that burden. The district court found, and I want to quote, the underwriters have not put forward sufficient evidence to meet their burden to provide an evidentiary basis for any such allocation, that is allocations and limits. That's what the district court found based on undisputed facts. When undefined, underwriters did not provide the court with any risk-based assessment of the claims asserted. With respect, I believe that they have to say, here, if there are multiple claims, some covered, some not, here's a risk-based assessment. Can regional minds disagree? Of course. If they do it in good faith, I would concede they pass. If they say, here's a good faith allocation under California law, I think they could do that. But the district court found this. They didn't even try. They didn't come in the same zip code as a good faith allocation. They just chewed up the books and said, your turn to pay now. And what happens in California law, I think, is automatic. Once you fail to meet your burden, you have to resolve the settlement, and the matter most favorable to the non-settling insurer. That's Dillingham, and that's our favor. They made that choice. They made the choice to do it that way. And no one has suggested, if we went to a remand, there's any evidence to do it any differently. So under the law, we would respectfully request that the equitable contribution denial reverse on the denial of our motion and enter judgment that none of the policy elements are exhausted. Thank you for your time, your honor. Let me ask you to clarify one point, please. Now, it seemed to me you were saying that they have the burden to show good faith, that they're saying you have the burden to show bad faith. So my misunderstanding, your arguments on both sides, or is that basically part of what this comes down to? I would submit that under California law, under Dillingham, and as the district court found, there is a very clear burden on behalf of the insurer seeking to erode limits because of an I mean, there's no way to read Dillingham otherwise. And that's what the district court said as well. Okay. So that's your view of Dillingham. But Mr. Williams was arguing a different Ninth Circuit case and saying it put the burden on you. What, if I, a fair point, if I understand Mr. Williams, he was saying access uses the word bad faith. So what I would submit this would be the sequence is can we show bad faith and how they allocate it and exhaust it? Absolutely. We have bad faith in abundance. What happens next? The district court found that it was bad faith. It's not like it's an open question. He said they, to the maximum extent possible erode limits. That's bad faith. What happens next? Then they have the burden to show that the allocation was made in good faith under Dillingham and they've completely failed in that burden. And then the court has no choice. We're not going to make up new evidence. There is no more evidence. You have in front of you every piece of evidence that exists in this case about whether that was done in good faith. And there is no evidence to support a good faith allocation along the lines they've said. By default, none of it goes against limits. Thanks, counsel. Thank you, your honors. Do Judge Nelson and Judge Kelly have further questions? No. Okay. Therefore, Scottsdale case shall now be submitted. Thank you, your honors. We'll hear from us in due course. Thank you. Thank you, your honors.
judges: Kelly, Gould, Nelson